First case this morning is case number 4-17-0364, Deanna Perkinson v. Sarah Courson. Appearing for the appellant is attorney Amy Jackson and for the appellee is attorney Timothy Chartrand. Yes, I think we have a switch. Oh, I'm sorry. You're absolutely right. For the appellant is attorney Timothy Chartrand and for the appellee is attorney Amy Jackson. Good morning, counsel. All right. Mr. Chartrand, are you ready to proceed? I am ready. You may. Good morning, Your Honors. May it please the Court. My name is Tim Chartrand. I represent the appellant in this case. This case stems from two orders at the trial court level, which we've appealed from. The first is an order which stems from the defendant's motion to dismiss. Under that motion to dismiss, they attempted to dismiss count one of the plaintiff's complaints based on conflicts of law analysis. We've made two arguments as to how the trial court erred as to this order. The first argument we made is that the motion to dismiss was brought under the wrong procedural mechanism and that it was brought under a Rule 2615 motion, which attacks the face of the complaint. It doesn't bring forth an affirmative defense. However, they brought forth an affirmative defense by attacking it under the conflicts of law. Did you raise that at the trial level? We did not, Your Honor. Isn't that a problem when you're arguing at the appellate level? You're essentially arguing that the trial court should be reversed based upon an argument that never occurred? Yes, Your Honor, and the defendant and we in our response bring forth the law that basically, if the justice requires, so requires you to, you can bring forth a complaint. That argument would swallow, that exception would follow the rule if that were to be the case. Why should, what is so special about this case where we should conclude that we're going to reverse the trial court based on an argument I've never heard, which is a position that, certainly speaking for myself and I think for this court, we almost never do, counsel. I've read the briefs. What is there about this case that requires, justice requires that we ignore that rule? Well, I think the issue here is whether the conflicts of law is an affirmative defense versus whether it can be brought under 2615. There's a bit of a gray area, so I think that makes this case a little bit special. I think you're probably right. It's not a gray area at all. It's not a 2615. It's a 2619. I didn't make this argument. My question is, what about this case suggests that we should ignore this pretty fundamental rule and apply an exception which almost never applies? Well, then in that case, I don't think you should, Your Honor. Okay. Go ahead. Second argument that we make as the first order that we've appealed from is that Illinois actually has a more And Illinois is a foreign state, so we apply Illinois conflicts of law rule. Under Illinois, the conflicts of law, we have to determine which has a more substantial relationship. It is true that the state of where the injury occurred has the rebuttable presumption that that's the state's law that applies. However, we have to look at a number of different factors to determine if there's a different state with a more substantial relationship. Those factors are found under Section 145 and Section 62 of the Restatement Seconds of Conflicts of Law. Under those factors, I'm going to go with the 145 factors first. There's four different factors under there. The first is the place of the injury, which is the basis of the rebuttable presumption. The second is where the wrongful conduct occurred. The third is the domicile residence of the parties. And the fourth is where the relationship, if any, is centered. Now, as to the first factor under 145, there's no doubt that Missouri is the place where the injury occurred. However, I've cited a number of different cases, in particular Miller, Schultz, and Murphy, that say that if the injury occurred fortuitously in that state, then this factor is of minimal importance. The argument is that this injury did, in fact, fortuitously occur in Missouri. The reason being is that this particular force that kicked my client had been housed, stabled in Illinois, had been trained in Illinois, had been ridden mostly in Illinois, and had already kicked another person in Illinois. Now, this injury could have happened just as easily in Illinois as it did in Missouri. And the defendant appellee says, well, you know, this was a planned trip to Missouri. They were not in Missouri fortuitously. And that's true. This was a planned trip to Missouri. Murphy actually addresses this exact issue. In that case, the plaintiff had bought, licensed a car in Illinois, was driving back to his home of 26 years in Michigan. And while driving through Illinois back to Michigan, he rolls his car. The court there said that although he wasn't going to Michigan fortuitously, he had a planned trip to Michigan, that the injury occurred in Michigan fortuitously because it could have just as easily happened in Illinois when he was driving through Illinois. So that's the same argument we have here. Although our client wasn't in Missouri fortuitously, this injury could have just as easily happened in Illinois because, again, the horse had already kicked someone here, was trained and ridden mostly in Illinois. Had there been a group ride in Illinois similar to the one that occurred in Missouri? The defendant had testified that part of her training of this particular horse was to group ride, and that was mostly occurring in Illinois. With the same horse? Correct. So you're saying that the nature of the group ride in Missouri wasn't so unique that the choice of law would favor Missouri? Yes, as to the first factor under 145. The second factor is where the wrongful conduct occurred, and it is true under the Illinois Animal Control Act that wrongful conduct would have been the kicking by the horse, and that did occur in Missouri. So the second factor would weigh in favor of Missouri. As to the third factor, there is no dispute that the residency of the two parties in this case is Illinois. They're both residents of Illinois at the time of the injury, and they still are today. And then the fourth factor is where the relationship, if any, was centered. Now this particular factor is interesting because the defendant appellee is kind of all over the place on this one. They don't address it at first. Then they say the nature of the relationship here was centered on their horseback riding, which, if true, would still be Illinois because the testimony supports that these two parties had ridden together in Illinois more than they had in Missouri. And then in her appellee brief, she states that the nature of their relationship was being a part of this mutual friend group, which, again, if true, would be supportive of Illinois law because this same mutual friend group hung out in Illinois more than they did in Missouri. But the true nature of this relationship isn't about its characterization. It's about a number of different facts that we have mentioned. Our supportive law on this is the Miller case and the Esser case. The Miller case is a case where two roommates and friends were driving from Illinois back to university in Colorado, and they rolled over in Colorado, the car rolled over. And the facts that they looked at in the Miller case was where did the parties meet? They looked at so specific facts such as one party had cut another party's grass in the summer in Illinois, and they looked at a number of different facts there. In the Esser case, they noted some facts like where were the other vacationers from? Where did they leave from? Where did they come back to? Here in the facts is that our parties met in Illinois through their husbands at the time. My client sold her house to the defendant in Illinois. They rode their horses more in Illinois. They went to social gatherings and socialized more in Illinois. It is true that there may be contacts to both Missouri and Illinois under this factor, but it's clear that the relationship here was centered in Illinois between these two parties. And so under the 145 factors, the last two factors clearly weigh in favor of Illinois. The first is of minimal importance, and the second weighs in favor of Missouri. Then in addition to those factors, we have to look at 6-2 factors. In the 6-2 factors, there are a lot of the 6-2 factors that are minimally implicated in a personal injury by accident. But there are seven factors under there, and the ones that are really relevant to this case is the policies of the form state, which is Illinois, the policies of other interested states, which is Missouri. And under that, the ESSER court is again a good case to look at, and I've cited throughout my brief. The ESSER court noted that the common law policy of Illinois is that we apply Illinois law to conflicts between Illinois residents which result in injuries to Illinois residents. That's exactly what we have here. An ESSER was a vacation from Illinois to Mexico, injury by an Illinois resident from the negligent conduct of another Illinois resident. The court said we apply Illinois law here. That's what common law policy does under the 6-2 factor. In addition, we have the Illinois Animal Control Act, which the policy behind that act is to shift the burden of the injury to the person that's in the best relationship to that animal. In contrast, the only law that's been brought up by the defendant as to Missouri that should apply here is the Equine Liability Act, which, by the way, Illinois has an Equine Liability Act that's essentially the same. Missouri Equine Liability, the policy behind that is to codify the defensive assumption of risk. It's our contention that the policy of Illinois is stronger in this case to apply to it than Missouri law is. Those additional 6-2 factors, along with the factors under 145, support the contention that Illinois has a more substantial relationship to this case than Missouri does. For that reason, the first order as to the defendant's motion to dismiss should be remanded so that we apply Illinois law, in particular the Illinois Animal Control Act, to this case. The second order from which we appeal is based on the defendant's motion for summary judgment. They brought two different arguments for summary judgment. One was an express assumption of risk based on a release that my client signed, and the second was an implied primary assumption of risk. Under the express assumption of risk, my brief analyzes both Missouri and Illinois because I believe that it's ambiguous, the order is ambiguous as to which one applied, but the law is not too different. But as attacking the express assumption of risk argument, I brought forth three different arguments myself. One was the format of the release. The format release here, the title of the form was a registration form. My client had signed this form a number of times. You sign it when you first get to the horseback riding place, and on the very top it says very clearly, registration form. She always believed it was a registration form. How many stables you needed to have, you need to sign it before you ever get on the property. The release is farther down on the page, and actually the release that's specific to my client is on the second page of the form. So we believe the format doesn't properly notify my client that she's ever expressly releasing liability of the defendant in the future. The second argument I bring forth is the exculpatory clause in the release, which says that the releasees, which would be my client, I'm sorry, the releaseors are releasing the releasees of any negligence or otherwise. Now the problem we have and the issue we take place with is the word and otherwise, which is a broad-stroke definition, which can encompass a number of potential causes of action, like intentional torts. It can encompass willful and wanton conduct, and recklessness, which are two causes of action you can never release under Missouri or Illinois law, whichever is deemed to apply to this particular account. In our cited case law, it says for that reason, when you try to release causes of action and don't clearly delineate what those are, then that exculpatory clause is uncertain. It's ambiguous. And then my final argument as to the exculpatory clause is that the term participants is ambiguous, providing its context within the exculpatory clause, and that it's susceptible to two reasonable definitions, interpretations, in that the word participants can mean people that are intimately involved in the business of horseback riding. And then you have the defendant's interpretation, which is that it's all participants of horseback riding, which would be 1,500 people. So those are the three ways we attack their express assumption of risk argument. And then we attack their implied primary assumption of risk argument because they're saying that horse kicking is an inherent risk of horseback riding. And my client acknowledges that, but that's not the risk that we have here. The risk that we have here is a client as the defendant who's drinking while she's riding her horse, and she doesn't trust her horse, and she rides too closely, by her own definition of too closely, to my client's horse, which kicks her. That's the risk that we have. I don't understand the argument about participants. As opposed to participants including everyone who's riding a horse or involved in it, it should be a more narrow interpretation? As you argue participants should be? Yes, Your Honor. The exculpatory clause has to be strictly construed, and we don't have a definition of participants. And participants is flanked by other terms like officers, agents, employees, marketers, all these people who are in a particular position that is furthering the business of the cross-trail, the horseback riding place. So I have taken a position that it's a reasonable interpretation to narrowly define participants as someone that's intimately involved in the business of cross-country trail, which my client is not involved in. Participants is a strange word to be substituted for other employees, isn't it? Well, I mean, I think the word, there is already employees in the, that's flanking the participant word. So, yeah, it wouldn't be other employees, but my definition of this is the catch-all for anyone else that is particularly involved in the business of the horseback riding place. Well, then it could have said, are anyone else involved in the business? And I agree with you. But participants seems to be a term identifying people going riding on the horses, doesn't it? I mean, I suppose, in retrospect, you could always claim words don't mean what they seem to mean, but why should they be construed in such a fashion? Well, and again, I mean, if participants were to mean anyone riding horseback riding, that would mean that it's their burden to show that my client unequivocally intended to release 1,500 riders then, which wasn't her intention at all. I mean, she thought it was a registration form the entire time. We have no testimony from cross-country trails as to what it means. So the only testimony we have in this case is from the plaintiff, and she said she didn't intend that, and it's their burden to show that she did intend that. It's their burden to show what she intended when she signed the form? And again, she thought she was signing a registration form, but she did sign the form. Well, why does it matter what she thought she was signing? I mean, gee, you know, I guess here's this clause that is designed to hold harmless, and as long as I say I didn't read it and didn't pay attention to it, it doesn't work? Well, it matters that she didn't know what she was signing because that release has to clearly notify the plaintiff that she's releasing people. This one is entitled the registration form. So that summarizes my arguments as to both orders, Your Honors, and I thank you for your time. Okay, thanks. Ms. Jackson. Thank you. Good morning. Okay, please support Mr. Chartrand. I do have a question. Ms. Jackson, you heard the questions asked on the counsel, but it's troubling that we continue to see the mischaracterizations of motions to dismiss when there are really only two, and the Supreme Court and this Court has written constantly about the differences and about how they're supposed to be used for different purposes, and we seem to get case after case where it's like lawyers don't bother to read the case law or even think about these motions when they file. So we have here a motion that is inept, is it not? Well, I don't necessarily concede that. The 2-615 was filed on the basis that it contained a count, that the complaint contained a count that failed to state a cause of action upon which relief could be granted. Why did it fail to state it? What was the problem with the count? Count one, the Animal Control Act, our allegation in the motion to dismiss was that it failed to state a cause of action because Illinois was not the substantive law that would apply to the case. Okay, go ahead. In response to our motion to dismiss, the plaintiffs filed a very lengthy response, and as Mr. Chartrand acknowledged this morning, they did not, she did not raise the issue of 2-615 versus 2-619, but instead acquiesced to proceeding under this particular motion and filed a substantive response based on the conflict of laws analysis. The court provided both parties full opportunity to conduct discovery and present factual information that would allow the court to consider the conflict of laws. So, in essence, it allowed this to proceed as a 2-619 motion? Without saying that, yes. And, you know, if there was prejudice in this to the plaintiff, then we may have a different situation here. In the plaintiff's brief, they suggest there was prejudice because they were somehow forced to prove their case at this pleading stage, but that's not what happened at all. The plaintiff's case was the allegation regarding the horseback riding trip and whether there was a duty and liability and the injuries. None of that came into play here at all. The facts that were gleaned from discovery that were presented to the court involved only the issues raised by those conflict of laws factors. The plaintiff wasn't required to prove her case at that early stage, so there was no prejudice. If this court finds that I was in error in bringing this as a 2-615 motion, then I certainly apologize to this court, but there was no prejudice and the matter should not be reversed on that basis. I do want to address the conflict of laws analysis that was performed by the trial court. And I think when this court considers this particular issue, the one thing that you have to bear in mind before you do anything else is the statement from the Townsend v. Sears and Roebuck case, which said there is a strong presumption that favors application of the law of the state where the injury occurred. Now plaintiff has argued that the law of Missouri, that this presumption is not really applicable here because these parties were only fortuitously in Missouri, that this incident could have happened anywhere. I beg to differ. The cases that the plaintiff has relied on, Miller and Murphy and Scholes, all involve factual situations that are very different from what we have here. Those three cases all involve automobile accidents where parties were traveling across country from one state to the next, something happened, and there was an accident. And the courts in examining those cases said, you know, this car accident could have happened anywhere. They were just driving. And this accident could have happened anywhere. The fact that it happened in Michigan or Illinois or Colorado or wherever was just happenstance. And that didn't give that state then an overwhelming need to have its laws applied to that accident. Our case is different. The trail riding event at Cross Country Trail Rides is a distinct and different event from any other trail riding event that may occur. You heard Mr. Chartrand say there were 1,500 people there for this trail ride over the Labor Day weekend. This was a huge event. It so happened that both Sarah Corson and Deanna Perkinson decided to go to this trail riding event. It just so happened that at this particular moment in time they were riding alongside each other and talking. The nature of the trail itself, it was hilly at the point where they were. There were a number of other people there on the trail ride. We don't know what all the other trail riding events may have been across the state, but this was a particular specific event, and this accident may not have just occurred anywhere else. These two parties also voluntarily and specifically elected to go to this location for the entire weekend. They weren't just traveling through Missouri. You know, maybe it would be different, Your Honors, if they were on horseback and just riding along on their own, started off somewhere, say, in Quincy, and then ended up crossing the river into Hannibal, and then they were going to come back around. If there's an incident there, maybe that's different because it's just fortuitous that they're going along and crossing state lines. This is different. This was an intentional meeting up in one particular location for a specific event. So I do think the point of that is that this strong presumption that favors application of the law from the state where the injury occurred applies in this case. So with that in mind, what you have to find in order to reverse the trial court's finding is that there are other contexts that Illinois has between the controversy and the parties that make Illinois' context more significant, sufficient to overcome this strong presumption that favors Missouri law. And as we've indicated in our brief, I would suggest to you that those things, that's just not the case. Does Illinois have contacts? Does Illinois have an interest in the controversy and the parties? Absolutely. Yes. We're not saying it doesn't. Both of these individuals are Illinois residents. But that in and of itself cannot be the determining factor. The Esser case, which the plaintiff has cited, involved two Illinois residents who ended up on vacation in Mexico. And while in Mexico, of all things, the plaintiff slips on an unpopped kernel of popcorn. In that situation, the Illinois court decided that Illinois' interest in having Illinois law apply was more significant. Why? Because if the plaintiff was left pursuing their case in Mexico, there was no recovery. There was no right of recovery at all. And Illinois has a strong interest, understandably, in ensuring that its citizens have a right of redress when there is a wrong that occurs between two Illinois residents. And if they would have allowed the application of Mexico law, there would have been no ability of the plaintiff. What's the right of redress in Missouri? I'm sorry? What's the right of redress in Missouri? The right of redress in Missouri is through the Missouri Equine Liability Act, which, as Mr. Chartrand pointed out, is very similar to the Illinois Equine Liability Act. And I believe that works in favor of our argument that Missouri, the strong presumption that favors Missouri, cannot be overcome. Illinois, in this case. But it's way different than the Illinois Animal Control Act. It is different than the Animal Control Act, but the difference in laws should not be what's controlling here. Certainly, the plaintiff would like to have her case heard in Illinois because she may have a better chance of recovery. But that's not the issue. She has a right of redress in Missouri, under Missouri law, that is similar to an equivalent Illinois law. So Illinois' interest here in ensuring that its citizens have a right to have their claims heard and have a recovery, if it's found to be appropriate, is satisfied. Ms. Jackson, the plaintiff writes in her brief that Illinois law provides an advantage to persons injured by a horse in a similar fashion as the plaintiff here in goes on to talk about under Illinois law she would not have to hire an expert witness if there are traditional substantive defenses that are not available under Illinois law. Does it matter in the choice of law analysis as to whether or not a set of laws are advantageous to a particular party? My argument is that it does not matter. And I think part of the reason I say that is you have to look at the differing laws here. And part of the choice of law analysis is the interest of each particular state in its policies and enforcement of its own laws. The Animal Control Act in Illinois has for years been commonly referred to as the dog bite law. The one bite was adopted to counteract this one bite rule intended to provide redress for those individuals who may not be aware of the risk that a particular animal poses and may not be able to avoid that risk. The Illinois Equine Liability Act and the Missouri Equine Liability Act are different. They support different policies. They are particularly focused on equine activities because both states, both Illinois and Missouri have recognized that there are inherent risks involved in equine activities and that most persons, not all, but most persons who are engaged in those equine activities are fully aware of the risks. And they assume those risks voluntarily when participating in those equine activities. So while the Animal Control Act may provide a greater ability of an individual to recover, certain defenses are not available, that should not be the deciding factor here. You need to look at the nature of the event that we're talking about, an equine activity. You have a plaintiff and a defendant, for that matter, who are both very experienced horsewomen. The plaintiff was aware of all of the risks associated with this. So it's not like, she's not like the individual in an Animal Control Act case who encounters a dog, for example, and has no reason of knowing that that dog may be vicious, that that dog may have attacked other people, and maybe she doesn't have any real way to avoid the dog. Maybe the dog runs up to her and bites her. This is a factually different situation. So I think you have to look at the totality of the circumstances when you're evaluating which and whether Illinois has contacts that are more significant, sufficient to overcome the strong presumption that Missouri law should apply. The last thing I want to touch on in this regard is the fact that Missouri has a vested interest in ensuring the certainty, predictability, and uniformity of the result. As I mentioned earlier, this was not just a random horseback ride through the countryside. This is a Missouri business, cross-country trail rides. And yes, the businesses have to party here. But you have 1,500 people coming to this facility just over one weekend, okay? And is there a potential for there to be injury, for there to be accidents, for something to happen with 1,500 people? Sure. Of course there is. Missouri would like to control what happens within its borders. And if you've got the potential for lots of different injuries or accidents occurring and you allow the law of the state where the injured person resides to control, then you're likely to have a huge variety of different outcomes. And that really doesn't serve the purposes of Missouri's policy in enacting the Equine Liability Act. We believe the trial court's decision dismissing Count 1 and ordering that Missouri law apply should be affirmed by this court. If there are no other questions on that topic, I am going to move ahead. I do want to address kind of the final conversation that was taking place here regarding the release and the language in the release. The release was provided for you in our brief, portions of it were. So while this release at the very top did say something to the effect of registration form, also about halfway down the page in capital letters it said release of liability. And it didn't just say it once. It said it three times. Because Deanna Perkinson signed this release three different times. For herself and for two minor children that were with her. It is totally irrelevant, totally irrelevant that Deanna Perkinson did not read this release. It is completely irrelevant what she believed it to be. The case law that we have cited for you in our brief very clearly states that individuals of common intelligence, as Ms. Perkinson is, are understood and presumed to understand documents that they sign. We cited a case, a Haynes case, where we had an individual who had only a second or third grade education. Standing in line to get into, I think it was an automobile race. And he felt pressured. There were lots of people in line. And he was handed a form and he just signed it. And it was a release and a waiver of liability. Well, the court in Haynes said that's enforceable. It doesn't matter that he didn't read it. He could have. Even this individual of a second or third grade education could have read the form. If he didn't understand it, he could have asked. And he didn't do either of those things. So it was enforceable against him. Plaintiff's other primary argument regarding the terms of the release is that the terms are ambiguous. We both cited a variety of cases. Those cases, you have to look at the language of the release that was at issue in each of those cases. And the cases relied upon by the plaintiff provide language that is distinguishable from the language that we have. Primarily, most of those releases failed to include language specifically that the person signing the release was releasing the owner of the facility from negligence for their own actions. Our release says that. Our release talks very specifically about waiving liability for injuries, death, disfigurement. It's very specific. And it also includes the term participants. Participants can be included in an exculpatory clause. And the term participant, consistent with common rules of contract construction, should be given a plain and ordinary meaning. Participants include anyone participating in the trail ride event. Ms. Jackson, you twice stressed in your argument that there were 1,500 people. There is it reasonable that a person would sign a release knowing that they were waiving liability for all 1,500 participants? What if it were 15,000 participants? Is that reasonable? Conscionable? That's not the question, Your Honor. It's not? Okay. With all due respect. Well, pardon me. It doesn't matter whether it's reasonable for the individual to sign the release or not. The individual may elect to sign that release. Okay? In our deposition of Deanna Parkinson. Well, if the term's unconscionable, is it enforceable? I mean, that goes hand in hand with reasonable. Well, I think those are two different things. I would say release of liability for an event with 1,500 participants, I can't say that that's unconscionable. What I think this Court should look at is what Deanna Parkinson testified to in her deposition. Okay? She was fully aware of the number of participants there. She was aware of the other things that Mr. Chartrand mentioned. She knew that people were drinking beer on this trail ride. She knew that Sarah Corson's horse had previously kicked out on one prior occasion. Okay? And I asked her specifically, if you had read each individual term of this release, would you have understood it and would you have signed it anyway? And she said, without hesitation, yes. I said, if you realized that by signing this document you were releasing cross-country trail rides and all the other participants, would you have signed it anyway? Yes. Did you know Sarah Corson was a participant? Yes. She also admitted in her deposition that she knew there was a risk of injury. She knew that horses could kick. She knew that a horse could kick regardless of whether the rider did anything or didn't do anything, that that was just something that the animal could do. So whether she read the release or believed it to be a registration form is irrelevant. Had she read it, she testified that she would have understood it and she would have voluntarily gone ahead with the trail ride and would not have done anything different. I see that I'm out of time. If anyone has any other questions, I'd be glad to answer them. I see no other questions. Thank you. I appreciate your time this morning. Okay. Thank you, Ms. Jackson. Mr. Chartrand, rebuttal argument? Yes, Your Honor. I won't take much time. I just want to address a couple of things. Amy talks about how Miller, Schultz, and Murphy are factually different in the current case in the issue of fortuitous injury in Missouri versus Illinois. And although they might be factually different, and trust me, I tried to search for a case like this to be spot on factually, the general principles of those cases remain the same as to fortuitous injuries. And in particular, I direct your attention to Murphy. Again, he's driving from Illinois to Michigan. He wasn't in Michigan and going to Michigan fortuitously. He had a planned trip there to go to his house of 26 years. And they said that even though he wasn't in Michigan fortuitously, it could have just easily happened in Illinois. The injury could have happened fortuitously even if he had a planned trip somewhere else. And so I think that the general principle of that applies here. This injury could have happened just as easy in Illinois. This horse was ridden more here in Illinois. It was trained in Illinois. It was stabled here in Illinois. And it had already kicked someone in Illinois. Ms. Jackson counters, and it's a persuasive argument, that this occurred in the course of a specific event that is unique. The terrain was unique. That same terrain doesn't necessarily exist in other trail rides. It involved a number of people, not just the plaintiff and defendant. So there are these unique characteristics to this trail event. And that then differentiates it from an auto accident where someone is driving down a road that could very well be a road in Illinois as opposed to Michigan. Well, these trails could very well be the same in Illinois as in Missouri. We don't know what kind of trail ride she actually rode in Illinois. We just know she rode in Illinois on trail rides. I mean, these trails could have been substantially similar to the one that the kick actually occurred at. We just don't know. It would be speculative at best to suggest that these trail rides she performed in Illinois were somehow different terrains than the ones she performed in Missouri. We simply don't know. And so I don't think that those are unique factors, and I don't think that she supports her burdens with any facts in that regard. I mean, this is a horseback riding event. This was a 1,500-person horseback riding event on Labor Day, yes. But it was a horseback riding event just like she had done in Illinois. It might not be a number of people. It may not have been Labor Day weekend, but she had performed horseback riding trails in Illinois just as she had here in Missouri with this exact same horse. So I think that the injury did fortuitously occur in Missouri, or yes, in Missouri, but it just easily applied in Illinois. But I want to point again to the Esser case because the Esser case is particularly important specifically to this case. Again, Esser may be factually different, but again, the general principles apply. And the Esser court found that the first two factors under 145, where the injury occurred and where the wrongful conduct occurred, supported Mexico law. Those factors weighed in favor of Mexico. But the other two factors under 145 weighed in favor of Illinois in addition to this common law policy that we apply Illinois to conflicts between Illinois residents that injure Illinois residents. So even if you don't agree with my argument that it fortuitously occurred in Missouri, and that would be a reasonable choice by you guys. I understand. Those first two factors would weigh in Missouri. The second two factors would weigh in Illinois here. And in addition, we have this common law policy that we apply Illinois law to conflicts between Illinois residents. It's the exact same situation as Esser. And I want to talk about the principle in Esser too. She claims that the principle here, the reason why they applied Illinois law is because Mexico wouldn't give them a cause of action. They wouldn't be able to recover. And I respectfully disagree. I believe the court talks about how it's a conflict between Illinois residents. That's the two parties. It's Illinois witnesses. It's Illinois medical treatment. That's exactly what we have here. We have the people that were with her on that trail ride were Illinois residents and their mutual friend group. These are Illinois parties. The majority of her medical treatment is in Illinois. And the horse that kicked my client was trained, housed, and ridden mostly in Illinois. The common law policy that Illinois law should apply here is strong. It's not because Illinois or Missouri won't give my clients a cause of action. It's because it's a conflict between Illinois residents. Illinois applies as far as the common law principle in Esser. I'm sorry. Yes, I'm sorry. Thank you, Your Honor. Okay. Thank you, counsel. Thank you both. The case will be taken under advisement.